IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| LAKEISHA C. RUFFIN, | ) CASE NO.  5:21-CV-01294-CAB |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) JUDGE CHRISTOPHER A. BOYKO |
| vs. | ) UNITED STATES DISTRICT JUDGE |
| | ) |
| COMMISSIONER OF SOCIAL | ) MAGISTRATE JUDGE |
| SECURITY, | ) JONATHAN D. GREENBERG |
| | ) |
| Defendant. | ) **REPORT AND RECOMMENDATION** |
| | ) |
| | ) |

Plaintiff, Lakeisha Ruffin ("Plaintiff" or "Ruffin"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED for further consideration consistent with this opinion.

## I.    PROCEDURAL HISTORY

In February and May 2018, Ruffin filed applications for POD, DIB, and SSI, alleging a disability onset date of March 15, 2017 and claiming she was disabled due to major depression, bipolar disorder,

_____

1 On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

chronic fatigue, fibromyalgia, strokes, migraines, trouble sleeping, seizures, nerve neuropathy, and anxiety.  (Transcript ("Tr.") 12, 83, 102, 123, 145.)  The applications were denied initially and upon reconsideration, and Ruffin requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 12.)

On June 10, 2020, an ALJ held a hearing, during which Ruffin, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On July 13, 2020, the ALJ issued a written decision finding Ruffin was not disabled.  (*Id.* at 12-22.)  The ALJ's decision became final on May 5, 2021, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On July 6, 2021, Ruffin filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 8-10.)  Ruffin asserts the following assignments of error:

(1)  The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers.  As such, the decision in this case by an ALJ who derived his authority from Andrew Saul was constitutionally defective.

(2)  The ALJ erred in forming the RFC when he failed to properly evaluate and include the totality of limitations related to Ruffin's severe impairments and misinterpreted the opinion of the treating source.

(3)  The ALJ erred in his evaluation of Ruffin's symptoms as the analysis was contrary to Social Security Ruling 16-3p.

(Doc. No. 8.)


## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Ruffin was born in November 1979 and was 40 years-old at the time of her administrative hearing (Tr. 12, 21), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).  She has at least a high school education and is able to communicate in English. (Tr. 21.)  She has past relevant work as a hospital cleaner and a hotel cleaner.  (*Id*. at 20.)

## B.    Medical Evidence[2]

A January 10, 2017 MRI of Ruffin's brain revealed an old left cerebellar infarct and cerebellar volume loss.  (Tr. 549.)

In February 2017, Ruffin underwent an awake EEG, which was normal.  (*Id.* at 433.)  However, the EEG results did not rule out epilepsy.  (*Id.*)  In June 2017, Ruffin underwent a 24-hour ambulatory EEG, which was also normal but did not rule out epilepsy.  (*Id.* at 432.)

Treatment providers hospitalized Ruffin on March 29, 2017 after she reported suicidal thoughts, feeling overwhelmed, and not functioning.  (*Id.* at 489.)  Ruffin remained hospitalized until April 3, 2017.  (*Id.*)  At discharge, Ruffin was eating and sleeping well and denied suicidal thoughts.  (*Id.*)  Ruffin's diagnoses included major depression, recurrent, moderate, without psychotic features and obesity.  (*Id.*)

On March 17, 2018, Ruffin saw Kavitha Nidamanuri, M.D., for cardiac follow up.  (*Id.* at 455, 457.)  Ruffin reported intermittent palpitations, chronic fatigue syndrome, and fibromyalgia.  (*Id.* at 455.)  Ruffin told Dr. Nidamanuri she was working out.  (*Id.*)  On examination, Dr. Nidamanuri found normal heart sounds and normal extremities, as well as normal memory, coordination, and posture.  (*Id.* at 456.)  Dr. Nidamanuri noted Ruffin exercised every other day and was doing well overall, although she continued to have some fatigue.  (*Id.* at 457.)

On June 27, 2018, Ruffin saw Emily Waight, PA-C, for her migraine, ataxia, TIA, and transient alteration of awareness.  (*Id.* at 434, 438.)  Ruffin denied side effects from Topamax, as well as seizures, falls, and loss of consciousness.  (*Id.* at 434.)  Ruffin reported losing her balance lately and ongoing ataxia since her stroke, but she had not had any falls.  (*Id.*)  Ruffin also told Waight she had had a few headaches since her last visit, although she did not need her migraine medication for them.  (*Id.*)  Ruffin reported varied sleep, although it was not as bad as her last visit, stable mood, and no ER visits or hospitalizations

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

since her last visit. (*Id.* at 434-35.) On examination, Waight found normal speech and language, as well as normal gait and station, and no tremor or involuntary movements. (*Id.* at 437.) Regarding Ruffin's migraines, Waight recommended eight hours of sleep a night, reduced stress, healthy diet, regular exercise, and a headache log. (*Id.*) Waight noted Ruffin was doing well overall. (*Id.*) Regarding Ruffin's transient alteration of awareness, Waight suspected PNES, although Ruffin had multiple normal EEGs, and noted an abnormal MRI. (*Id.*) Ruffin was to follow up in three months. (*Id.*)

On September 19, 2018, Ruffin completed an adult function report. (*Id.* at 307-14.) Ruffin reported her impairments affected her ability to work, she could not sleep at all, she was depressed all the time, she went days without eating, dishes and laundry piled up, sometimes she wore the same clothes for days without bathing, and all she could was rest, sleep, and cry. (*Id.* at 307.) Ruffin reported needing encouragement from her mother to dress, bathe, and groom herself, and she needed reminders to take her medication. (*Id.* at 308-09.) She made simple meals once a day, and it took her 4-5 hours to do it. (*Id.* at 309.) She did chores when she had the strength to do them, and it took her "quite a while" to do them. (*Id.*) She could walk 20-30 steps before needing to rest. (*Id.* at 312.) She got along well with authority figures but did not handle changes in stress or routine well. (*Id.* at 313.)

On October 16, 2018, Ruffin saw Paul Scheatzle, D.O., for a functional capacity evaluation. (*Id.* at 602.) Ruffin complained of constant aching pain in her neck, mid back, and low back, as well as numbness and tingling in her hands and legs. (*Id.*) Ruffin rated her pain as an 8/10 and told Dr. Scheatzle that it interfered with her sleep. (*Id.*) Rest alleviated her pain. (*Id.*) Ruffin was interested in FMLA or disability, as she had chronic fatigue and pain and was very limited at work. (*Id.*) Ruffin reported right sided weakness, as well as balance issues, and that she had missed some work because of those issues. (*Id.*) On examination, Dr. Scheatzle found intact shoulder range of motion, no impingement, mild squaring cmc, tenderness of the anterior medial knee on the left, positive Appley's, negative Lachman's,

no effusion, guarding and spasm of the thoracic and cervical paraspinal muscles, interscapular trigger points, negative fibromyalgia trigger points, normal range of motion of the back, normal heel and toe walk, negative straight leg raise, normal muscle tone and strength, normal coordination, intact sensation, and normal gait.  (*Id.* at 602-03.)  Dr. Scheatzle diagnosed Ruffin with chronic fatigue, migraine aura without headache, migraine without aura and without status migrainosus, intractable, myofascial pain syndrome, sleep disorder, and recurrent major depressive disorder, in partial remission.  (*Id.* at 603.)  Dr. Scheatzle opined Ruffin could perform medium work, could walk occasionally up to one city block, could stand occasionally and sit frequently with a change of position every thirty minutes, could not climb or crawl, could not perform combined twisting and bending, and "[m]ay need to miss up to 3 times per month."  (*Id.* at 603-04.)  Dr. Scheatzle noted he would compete FMLA forms.  (*Id.* at 604.)

On November 12, 2018, Ruffin underwent an EMG of the bilateral upper extremities, which was normal.  (*Id.* at 828.)

On January 14, 2019, Ruffin saw Monica Winn, M.A., for counseling.  (*Id.* at 619.)  Ruffin reported being angry with some family members, that her mother's health was declining, and that she was behind on rent.  (*Id.*)  Winn noted Ruffin had made some progress and noted no significant change in her mood/affect, thought process/orientation, motor activity, speech, behavior/functioning, and medical condition.  (*Id.* at 616.)

On January 29, 2019, Ruffin underwent a sleep study, which revealed reduced sleep efficiency but no sleep apnea.  (*Id.* at 812.)

That same day, Ruffin completed another adult function report.  (*Id.* at 368-75.)

On February 5, 2019, Ruffin went to the emergency room with multiple complaints, including intermittent panic attacks.  (*Id.* at 1240.)  Ruffin denied anxiety at the time.  (*Id.*)  Ruffin's treatment and diagnoses focused on her physical complaints.  (*Id.* at 1240-42.)

5

On February 7, 2019, Ruffin saw Dr. Nidamanuri for follow up.  (*Id.* at 746.)  Ruffin told Dr. Nidamanuri she had a lot of stress and felt burning in her chest like acid reflux.  (*Id.*)  Ruffin reported trouble breathing, feeling tired, and heartburn, but denied palpitations.  (*Id.*)  Dr. Nidamanuri found normal findings on examination, and noted Ruffin was feeling well.  (*Id.* at 748-49.)

On February 12, 2019, Ruffin saw John Given, M.D., for a respiratory evaluation and asthma treatment.  (*Id.* at 759.)  Ruffin reported more stress, a cough with shortness of breath at times that was worse with stress, and increased GERD.  (*Id.*)  Ruffin endorsed shortness of breath with stress, activity, and sometimes laying down.  (*Id.*)  Ruffin occasionally wheezed and coughed.  (*Id.*)  On examination, Dr. Given found mild inflammation of the inferior turbinate bilaterally, no wheeze, intact memory, judgment, insight, mood, affect, and normal speech.  (*Id.* at 762.)  Dr. Given diagnosed Ruffin with moderate persistent asthma, chronic rhinitis, and GERD.  (*Id.*)

On February 14, 2019, Ruffin saw rheumatologist Alexander Hannon, D.O., to establish care.  (*Id.* at 1122.)  Ruffin complained of wide-spread arthralgias, severe fatigue, eye irritation, and itchy, gritty, watery, and burning eyes.  (*Id.*)  Dr. Hannon's examination revealed normal findings.  (*Id.* at 1125-26.)  Dr. Hannon diagnosed Ruffin with inflammatory polyarthritis and Vitamin D deficiency.  (*Id.* at 1126-27.)

In March 2019, Ruffin underwent another awake EEG, which was normal.  (*Id.* at 827.)  However, the EEG results did not rule out epilepsy.  (*Id.*)

In March 2019, Ruffin began physical therapy for her chronic fatigue syndrome and inflammatory polyarthritis.  (*Id.* at 978-79.)  Ruffin attended physical therapy through April 2019.  (*Id.* at 946-77.)  Ruffin consistently reported pain levels from an 8-9/10 and receiving no benefit from physical therapy.  (*Id.*)

On April 3, 2019, Ruffin saw Chadi Bouserhal, M.D., for a recheck of her sleep issues.  (*Id.* at 809.)  Ruffin complained of non-restorative sleep and Dr. Bouserhal noted her Epworth Sleepiness Scale

was 14. (*Id.*) Dr. Bouserhal diagnosed Ruffin with hypersomnia and ordered a multiple sleep latency test. (*Id.* at 410.)

On April 8, 2019, Ruffin saw James Bavis, M.D., for her CVA and seizures. (*Id.* at 829, 833.) Ruffin reported not having any CVA symptoms and that she was stable. (*Id.* at 829.) Ruffin told Dr. Bavis she had seen an eye doctor who was evaluating her loss of vision at night. (*Id.*) Ruffin reported no further episodes of waking up with tongue biting. (*Id.*) Dr. Bavis noted her EEG was normal. (*Id.*) On examination, Dr. Bavis found normal speech and language, normal memory and concentration, normal fund of knowledge, intact cranial nerves, normal muscle tone and strength, no cogwheel rigidity, no tremor or involuntary movements, two out of four symmetrical deep tendon reflexes, normal coordination, and normal gait and station. (*Id.* at 831.)

Imaging taken on April 23, 2019 revealed minimal levocurvature and mild dextroscoliosis in her back but was otherwise unremarkable. (*Id.* at 980, 984.)

On July 2, 2019, Ruffin saw Jennifer Spies, MSN, CNP, for medication management and psychotherapy. (*Id.* at 1272.) Ruffin reported fluctuating moods and increased anger and irritability since her last appointment. (*Id.*) Spies noted Ruffin's mood fluctuations were related to situational stressors. (*Id.* at 1273.) Spies determined Ruffin's mental status examination was unremarkable, as she had a euthymic mood, full affect, clear speech, logical thought process, normal thought content and perception, normal cognition, average intelligence, good insight and judgment, and good progress. (*Id.* at 1273, 1277.) Spies continued Ruffin's medication. (*Id.* at 1277.)

On July 11, 2019, Ruffin saw Dr. Bouserhal for follow up. (*Id.* at 1018.) Dr. Bouserhal noted the MSLT revealed idiopathic hypersomnia with long sleep time and no REM onset sleep was found. (*Id.* at 1019.) Dr. Bouserhal diagnosed Ruffin with hypersomnia with long sleep time, idiopathic and shift work sleep disorder. (*Id.*)

On July 12, 2019, Ruffin saw Dr. Given for follow up.  (*Id.* at 1039.)  Dr. Given noted Ruffin's asthma was controlled, she rarely needed to use her rescue inhaler, and she was satisfied with her current treatment.  (*Id.*)  Ruffin's rhinitis and GERD were also controlled.  (*Id.*)  On examination, Dr. Given found mild inflammation of the inferior turbinate bilaterally, no impairment of air exchange, intact memory, judgment, insight, mood, affect, and normal speech.  (*Id.* at 1042.)

On October 7, 2019, Ruffin saw Dr. Bavis for follow up.  (*Id.* at 1510, 1514.)  Ruffin denied seizures and falls.  (*Id.* at 1510.)  Ruffin reported continued chronic unsteadiness that was unchanged, and hypersomnia without sleep apnea.  (*Id.*)  On examination, Dr. Bavis found normal speech and language, normal memory and concentration, normal fund of knowledge, intact cranial nerves, normal muscle tone and strength, no cogwheel rigidity, no tremor or involuntary movements, two out of four symmetrical deep tendon reflexes, normal coordination, and normal gait and station.  (*Id.* at 1512.)

On October 9, 2019, Ruffin saw Dr. Hannon for follow up.  (*Id.* at 1452.)  Ruffin reported widespread myalgias of her upper and lower extremities bilaterally, as well as her upper back and torso, and told Dr. Hannon her medications had not been effective.  (*Id.*)  On examination, Dr. Hannon found "some degree" of tenderness and discomfort to palpation throughout the trapezius muscles bilaterally, no frank peripheral joint swelling, warmth, or erythema, normal muscle strength and tone, and normal gait.  (*Id.* at 1454.)  Dr. Hannon diagnosed Ruffin with lower back pain and fibromyalgia and referred her to a pain management clinic.  (*Id.* at 1455.)

On November 6, 2019, Ruffin saw Dr. David Gutlove for pain management.  (*Id.* at 1403.)  On examination, Dr. Gutlove found Ruffin walked with forward flexed posture and had pain with lumbar extension, rotation, and lateral lift.  (*Id.* at 1404.)  Dr. Gutlove further found 4/5 strength in the lower extremities, positive straight leg raise bilaterally at 45 degrees, negative Faber sign, and negative Patrick sign.  (*Id.*)  Dr. Gutlove diagnosed Ruffin with lumbar degenerative disc disease, lumbar degenerative

8

joint disease, lumbar facet arthropathy, lumbar facet syndrome, low back pain, intermittent lumbar radicular symptoms, fibromyalgia, myofascial pain syndrome, chronic pain syndrome, history of seizures, history of migraine headaches, asthma, depression, and anxiety.  (*Id.*)

On January 6, 2020, Ruffin saw Spies for follow up.  (*Id.* at 1515.)  Ruffin reported she got a job cleaning at Commquest because they paid more.  (*Id.*)  Ruffin reported sleeping well through the night and stability of her mood.  (*Id.*)  Spies again found Ruffin's mental status examination unremarkable, and that she had made good progress.  (*Id.* at 1516, 1520.)

On January 24, 2020, Ruffin saw Dr. Gutlove for follow up.  (*Id.* at 1528.)  Ruffin rated her low back pain as a 7-8/10 and described it as aching.  (*Id.*)  On examination, Dr. Gutlove found Ruffin had no difficulty getting up from and sitting down into a chair, a normal gait, the ability to toe and heel raise, and the ability to do a deep knee bend without much difficulty.  (*Id.* at 1531.)  Ruffin reported doing well on medication and denied any side effects.  (*Id.*)

On January 27, 2020, Ruffin saw Dr. Bouserhal for follow up.  (*Id.* at 1534.)  Ruffin reported intermittent non-restorative sleep and frequent excessive daytime sleepiness.  (*Id.*)  Dr. Bouserhal noted the medication he had prescribed had caused an increase in Ruffin's blood pressure, so he adjusted her medication to a lower dose.  (*Id.* at 1536.)

On April 17, 2020, Ruffin saw Dr. Given for follow up.  (*Id.* at 1597.)  Dr. Given noted Ruffin's asthma was controlled, she rarely needed to use her rescue inhaler, and she was satisfied with her current treatment.  (*Id.*)  Ruffin's rhinitis was controlled, although her GERD was uncontrolled.  (*Id.*)  On examination, Dr. Given found moderate inflammation of the right inferior turbinate, moderate to severe inflammation of the left inferior turbinate, severe inflammation of the oropharynx, no impairment of air exchange, normal neurological examination, normal strength and gait, intact memory, judgment, insight, mood, and affect, and normal speech.  (*Id.* at 1600.)

9

On May 19, 2020, Ruffin saw Dr. Bavis for follow up.  (*Id.* at 1604, 1607.)  Ruffin denied seizures, falls, and stroke symptoms.  (*Id.* at 1604.)  Ruffin reported increasing sleepiness, and another doctor had her on medication for her hypersomnia.  (*Id.*)  Ruffin told Dr. Bavis she was sleepy and tired at work.  (*Id.*)  On examination, Dr. Bavis found normal speech and language, normal memory, and normal concentration.  (*Id.* at 1605.)

### C.    State Agency Reports

#### 1.    Mental Impairments

On February 28, 2019, Kristen Haskins, Psy.D., reviewed the file and determined Ruffin had mild limitations in her abilities to understand, remember, or apply information, interact with others, and concentrate, persist, or maintain pace, and no limitation in her ability to adapt or manage herself.  (*Id.* at 94, 113.)  Dr. Haskins determined her mental limitations were not severe.  (*Id.*)

On October 22, 2019, on reconsideration, Karla Delcour, Ph.D., affirmed Dr. Haskins' findings. (*Id.* at 137, 159.)

#### 2.    Physical Impairments

On July 22, 2019, Yeshwanth Bekal, M.D., reviewed the file and determined Ruffin could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about six hours in an eight-hour workday, sit for more than six hours on a sustained basis in an eight-hour workday, and had an unlimited ability, other than as shown for lift and/or carry, to push and/or pull.  (*Id.* at 96-97, 115, 117.)  Ruffin had an unlimited ability to kneel, crouch, crawl, and balance, she could frequently stoop, and she could occasionally climb ramps/stairs, but she could never climb ladders, ropes, or scaffolds.  (*Id.* at 96-97, 115-16.)  Ruffin must avoid concentrated exposure to humidity and fumes, odors, dusts, gases, and poor ventilation, and she must avoid all exposure to hazards.  (*Id.* at 97, 116.)

10

On October 17, 2019, on reconsideration, Kalpna Desai, M.D., affirmed Dr. Bekal's findings.  (*Id.* at 139-41, 161-63.)

## D.  Hearing Testimony

During the June 10, 2020 hearing, Ruffin testified to the following:

- She holds a current driver's license with no medical restrictions.  (*Id.* at 39.)  She works 25 hours a week as a housekeeper at Commquest.  (*Id.*)

- She has chronic fatigue.  (*Id.* at 44.)  She starts working at 6:30 a.m. and by 9:30 a.m. she is exhausted.  (*Id.*)  She has to sit down several times a day to rest her feet and body.  (*Id.*)  She sometimes gets dizzy spells at work.  (*Id.*)  She has chronic pain in her feet and legs, and sometimes in her hand.  (*Id.*)  Her pain is an 8/10.  (*Id.*)  She takes medications as prescribed and has no side effects.  (*Id.*)  She has memory problems; her head feels fuzzy, and she cannot remember certain things.  (*Id.* at 45.)  She gets nervous to the point where she cannot concentrate at times.  (*Id.*)  She can walk for 20 minutes before needing to sit down and rest for five minutes.  (*Id.*)  She could lift 20 pounds.  (*Id.*)

- On a typical day, her alarm goes off at 5:15 a.m. and she lays in bed until 5:30 a.m. (*Id.*)  She gets up and gets ready to go to work.  (*Id.* at 45-46.)  She sits for five minutes after she gets to work and then gets her cart together and goes upstairs.  (*Id.* at 46.)  She takes a break between 9:00 and 9:15 a.m.  (*Id.*)  She sits down for an extra five minutes before she finishes what she needs to do.  (*Id.*)  She takes her lunch break and then finishes the rest of her shift.  (*Id.*)  She sits and takes breaks during her shifts "all the time."  (*Id.*)  Her shift ends around 1:00 p.m., and then she comes home and sits for about 45 minutes.  (*Id.*)  She showers and then gets something to eat.  (*Id.*)  She watches TV for a while, then tries to clean a bit and do some laundry.  (*Id.*)  She sorts the laundry and her daughter or mother washes it if she is too tired.  (*Id.* at 47.)  Then she sits down again.  (*Id.* at 46.)  She enjoys watching basketball and football games, and she enjoys being with her family.  (*Id.* at 46-47.)  Her mother visits twice a week.  (*Id.* at 47.)  She visits her mom and sees other family members.  (*Id.* at 48.)  She walks in the park either on days she has off or a few hours after her shift.  (*Id.* at 48-49.)  She walks around the length of a football field twice.  (*Id.* at 52.)  She feels tired after that.  (*Id.*)

- She is constantly tired on the days she works, and all she wants to do and lay down and rest.  (*Id.* at 48.)  Sometimes her body aches more than usual when she works. (*Id.*)  Her hands and feet tingle a lot, and she loses her balance "constantly."  (*Id.*)  She cannot stand in the shower.  (*Id.*)

- She cannot walk or stand that long.  (*Id.* at 50.)  She can stand for five to eight minutes.  (*Id.* at 52.)  Sometimes she falls when she loses her balance.  (*Id.* at 51.)  She has difficulty sleeping.  (*Id.*)  She sleeps for a few hours, then her pain wakes her up and sometimes keeps her up.  (*Id.*)  She tries to take sleeping pills for relief.  (*Id.*)  She

does not always get restful sleep.  (*Id.*)  She feels fatigued four days out of the week. (*Id.* at 52.)

- She uses a nebulizer every day.  (*Id.* at 53.)  She has a daily inhaler and a rescue inhaler.  (*Id.*)  She uses the rescue inhaler about four times a month.  (*Id.*)

- She has seizures and gets headaches twice a week.  (*Id.* at 54.)  When she gets a headache, she sees spots, lines, and things floating in the air.  (*Id.* at 55.)  Sometimes her headaches last all day.  (*Id.*)  She has medication to help prevent them and medication for when she gets one.  (*Id.*)

- She receives treatment, as well as medication, for her depression and anxiety.  (*Id.* at 56.)  Her medication helps her depression and anxiety.  (*Id.*)  She still gets racing thoughts, and it affects her ability to concentrate.  (*Id.*)

- Her mother has to remind her to take her medications.  (*Id.* at 57.)

- She sometimes still has heart palpitations.  (*Id.*)

- She felt relief during physical therapy from the water and the heat, but as soon as she got home her body stiffened up again.  (*Id.* at 50.)

- She has gotten forgetful a few times at work and her supervisors would watch her all day.  (*Id.* at 58.)

The VE testified Ruffin had past work as a hospital cleaner and hotel cleaner.  (*Id.* at 60.)  The ALJ then posed the following hypothetical question:

> Please assume a hypothetical individual of the claimant's age and education with past jobs described.  Further, assume the individual is limited to the full range of light with the following additional limitations.  Climbing ramps and stairs is limited to occasional.  Climbing ladders, ropes, or scaffolding is limited to never. Stooping is limited to frequent.  The hypothetical individual can never work at unprotected heights and never with moving mechanical parts.  Working in humidity and wetness limited to only occasional.  As working, as is working with dust, odors, fumes and pulmonary irritants also limited to occasional.  Following additional mental limitations, the hypothetical individual is able to perform simple, routine tasks.  Can the hypothetical individual perform any of the past jobs you described?

(*Id.*)

The VE testified the hypothetical individual would be able to perform Ruffin's past work as a housekeeping cleaner as generally performed, but not as actually performed.  (*Id.* at 61.)  The VE further

testified the hypothetical individual would also be able to perform other representative jobs in the economy, such as marker, toll collector, and routing clerk. (*Id.*)

The ALJ changed the exertional level to sedentary. (*Id.*) The VE testified the hypothetical individual could perform representative jobs in the economy, such as document preparer, order clerk, and cutter-and-paster. (*Id.*)

The ALJ added a limitation that the hypothetical individual would be off task more than 15% of the time. (*Id.* at 61-62.) The VE testified that limitation would be work preclusive. (*Id.* at 62.)

Ruffin's counsel asked the VE what the tolerance for absences would be, and VE testified it would be six to eight absences a year. (*Id.* at 62-63.)

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594

F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Ruffin was insured on her alleged disability onset date, March 15, 2017, and remains insured through December 31, 2024, her date last insured ("DLI").  (Tr. 12.)  Therefore, in order to be entitled to POD and DIB, Ruffin must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

2.  The claimant engaged in substantial gainful activity during the following periods: from the alleged onset date to November of 2018 (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 419.971 *et seq.*).

3.  However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity.  The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.

4.  The claimant has the following severe impairments: degenerative disc disease, obesity, chronic obstructive pulmonary disease (COPD)/moderate persistent asthma, depression, and anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

5.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

6.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with occasionally lifting and carrying less than 10 pounds and frequently lifting and carrying less than 10 pounds; sitting for 6 hours in an 8-hour workday; standing/walking for 2 hours in an 8-hour workday; pushing and pulling as much as she can lift and carry; never climbing ladders, ropes, and scaffolds; occasional climbing of ramps and stairs; frequent stooping; never working around unprotected heights or moving mechanical parts; occasional exposure to humidity and wetness; occasional exposure to dust, odors, fumes, and pulmonary irritants; and limited to the performance of simple, routine, and repetitive tasks.

7.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8.  The claimant was born on November **, 1979 and was 37 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

9.  The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

10.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

11.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

12. The claimant has not been under a disability, as defined in the Social Security Act, from March 15, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-22.)

## V. STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because

16

there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

In her first assignment of error, Ruffin asserts the ALJ "improperly determined that [her] chronic fatigue, migraines, myofascial pain syndrome, and sleep disorder were not severe impairments," which was contrary to the evidence in the record. (Doc. No. 8 at 11.)

The Commissioner responds that the ALJ's substantial gainful activity finding interrupted any duration of those impairments, and "most of the evidence" on which Ruffin relies predates the November 2018 end of substantial gainful activity.  (Doc. No. 9 at 17.)  In addition, the Commissioner responds that any error was harmless, as the ALJ was required to go on and consider all of Ruffin's impairments, severe and non-severe, in the RFC analysis since he found at least one severe impairment, and he did so.  (*Id.*)

The Act defines a disability as "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A medically determinable impairment is one that results from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory techniques.  *See* 20 CFR §§ 404.1521, 416.921; Social Security Ruling ("SSR") 96–4p, 1996 WL 374187, at *1 (July 2, 1996).  A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings.  *Id.*

 "[U]nder no circumstances may the existence of an impairment be established on the basis of symptoms alone."  SSR 96–4p, 1996 WL 374187, at *1.  Thus, "regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings."  SSR 96–4p (footnote omitted).  *See also* 20 C.F.R. §§ 404.1529(b), 416.929(b) ("Your symptoms . . .  will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present.").  *See also Torrez v. Comm'r of Soc. Sec.*, No. 3:16CV00918, 2017 WL 749185, at *6 (N.D. Ohio Feb. 6, 2017), *report and recommendation adopted by* 2017 WL 735157 (N.D. Ohio Feb. 24, 2017); *Crumrine-Husseini v. Comm'r of Soc. Sec.*, 2:15-cv-3103, 2017 WL 655402, at *8

18

(S.D. Ohio Feb. 17, 2017), *report and recommendation adopted by* 2017 WL 1187919 (N.D. Ohio March 30, 2017).  The claimant bears the burden of establishing the existence of a medically determinable impairment.  *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence thereof as the Secretary may require.").  *See also Kavalousky v. Colvin*, No. 5:12-CV-2162, 2013 WL 1910433, at *7 (N.D. Ohio April 19, 2013), *report and recommendation adopted by* 2013 WL 1910843 (N.D. Ohio May 8, 2013).

Once an ALJ has determined a claimant has a medically determinable impairment, the ALJ must then determine whether that impairment is "severe" for purposes of Social Security regulations.  *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  As noted *supra*, the regulations define a "severe" impairment as an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities . . ." 20 CFR §§ 404.1520(c), 416.920(c).  "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. §§ 404.1522(b), 416.922(b).  Examples include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  *Id*.

The Sixth Circuit construes the Step Two severity regulation as a "*de minimis* hurdle," *Rogers*, 486 F.3d at 243 n.2, intended to "screen out totally groundless claims."  *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985).  *See also Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008).  Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe."  SSR 96–3p, 1996 WL 374181, at *1 (July 2, 1996).  However, if an ALJ makes a finding of severity as to just one impairment, the ALJ then "must consider

limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96–8p, 1996 WL 374184, at *5 (July 2, 1996).  This is because "[w]hile a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim."  *Id.*  "For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do."  *Id.*

When the ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments at Step Two does "not constitute reversible error."  *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009).  The Sixth Circuit has observed that where a claimant clears the hurdle at Step Two (*i.e.*, an ALJ finds that a claimant has established at least one severe impairment) and a claimant's severe and non-severe impairments are considered at the remaining steps of the sequential analysis, "[t]he fact that some of [claimant's] impairments were not deemed to be severe at step two is ... legally irrelevant."  *Anthony*, 266 F. App'x at 457.

At Step Two, the ALJ found as follows:

> Similarly, the claimant has also been diagnosed with pneumonia, upper respiratory infection, gastroesophageal reflux disease (GERD), chronic rhinitis, chronic fatigue, migraines, myofascial pain syndrome, and sleep disorder (with a negative sleep study performed) (Exhibit 6F, pg. 5; 53F, pg. 4; 55F, pg. 4). However, there is little evidence of treatment for these conditions or support for finding that they cause functional limitations, and they may not meet the durational requirements of the Social Security Act. As such, the record does not document evidence that these impairments minimally interfere with the claimant's ability to engage in basic work-related functions.  As a result, these are not "severe" impairments, but will be considered in assessing the claimant's residual functional capacity.

(Tr. 15.)

20

The ALJ's failure to find Ruffin's headaches non-severe at step two is not reversible error so long as the ALJ continued through the remaining steps of the evaluation and considered Ruffin's headaches when assessing the RFC. *Maziarz*, 837 F.2d at 244. But review of the ALJ's decision reveals that the ALJ did not consider Ruffin's migraines in the RFC analysis. (Tr. 17-20.) Ruffin testified at the hearing that she got headaches twice a week, she sees lines, spots, and things floating in the air during her headaches, and sometimes her headaches last all day. (*Id.* at 55.) She further testified her medication to take once she got a headache only sometimes resulted in helping her headache go away. (*Id.*) Therefore, the ALJ's error at step two is not harmless, and the Commissioner's decision must be reversed. *Hart*, 2016 WL 6997906, at **4, 8 (reversing the Commissioner's decision because "the record does not reflect that the ALJ considered the limitations and restrictions imposed by all of Plaintiff's impairments. The ALJ's [step two] error here, therefore, is not harmless.").

As this matter is already being remanded, in the interest of judicial economy, the Court declines to reach Ruffin's additional assignments of error.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED for further consideration consistent with this opinion.

Date: April 14, 2022                              *s/ Jonathan Greenberg*
                                                  Jonathan D. Greenberg
                                                  United States Magistrate Judge

**<u>OBJECTIONS</u>**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).